# INTEL CORP. *v.* ADVANCED MICRO DEVICES, INC.

No. 02–572.   Argued April 20, 2004—Decided June 21, 2004

242

244

*Seth P. Waxman* argued the cause for petitioner. With him on the briefs were *Jonathan E. Nuechterlein, Joseph Kattan,* and *James A. Murray. Carter G. Phillips* argued the cause and filed a brief as *amicus curiae* for the Commission of the European Communities in support of petitioner under this Court's Rule 12.6. With him on the brief were *Virginia A. Seitz, Richard Weiner, Gene C. Schaerr,* and *Marinn F. Carlson.*

*Patrick Lynch* argued the cause for respondent. With him on the brief was *Jonathan D. Hacker.*

*Jeffrey P. Minear* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Acting Solicitor General Clement, Assistant Attorney General Keisler, Deputy Solicitor General Dreeben, Deputy*

*Assistant Attorney General Katsas, Michael Jay Singer,* and *Sushma Soni.*\*

JUSTICE GINSBURG delivered the opinion of the Court.

This case concerns the authority of federal district courts to assist in the production of evidence for use in a foreign or international tribunal. In the matter before us, respondent Advanced Micro Devices, Inc. (AMD), filed an antitrust complaint against petitioner Intel Corporation (Intel) with the Directorate-General for Competition (DG-Competition) of the Commission of the European Communities (European Commission or Commission). In pursuit of that complaint, AMD applied to the United States District Court for the Northern District of California, invoking 28 U. S. C. § 1782(a), for an order requiring Intel to produce potentially relevant documents. Section 1782(a) provides that a federal district court "may order" a person "resid[ing]" or "found" in the district to give testimony or produce documents "for use in a proceeding in a foreign or international tribunal . . . upon the application of any interested person."

Concluding that § 1782(a) did not authorize the requested discovery, the District Court denied AMD's application. The Court of Appeals for the Ninth Circuit reversed that determination and remanded the case, instructing the District Court to rule on the merits of AMD's application. In accord with the Court of Appeals, we hold that the District Court had authority under § 1782(a) to entertain AMD's discovery request. The statute, we rule, does not categorically bar the assistance AMD seeks: (1) A complainant before the European Commission, such as AMD, qualifies as an "interested person" within § 1782(a)'s compass; (2) the Commission is a § 1782(a) "tribunal" when it acts as a first-instance

---

\*Briefs of *amici curiae* urging reversal were filed for the Chamber of Commerce of the United States by *Roy T. Englert, Jr., Max Huffman,* and *Robin S. Conrad;* and for the Product Liability Advisory Council, Inc., by *Kenneth S. Geller* and *Miriam R. Nemetz.*

decisionmaker; (3) the "proceeding" for which discovery is sought under § 1782(a) must be in reasonable contemplation, but need not be "pending" or "imminent"; and (4) § 1782(a) contains no threshold requirement that evidence sought from a federal district court would be discoverable under the law governing the foreign proceeding. We caution, however, that § 1782(a) authorizes, but does not require, a federal district court to provide judicial assistance to foreign or international tribunals or to "interested person[s]" in proceedings abroad. Whether such assistance is appropriate in this case is a question yet unresolved. To guide the District Court on remand, we suggest considerations relevant to the disposition of that question.

### I

### A

Section 1782 is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals. Congress first provided for federal-court aid to foreign tribunals in 1855; requests for aid took the form of letters rogatory forwarded through diplomatic channels. See Act of Mar. 2, 1855, ch. 140, § 2, 10 Stat. 630 (circuit court may appoint "a United States commissioner designated . . . to make the examination of witnesses" on receipt of a letter rogatory from a foreign court); Act of Mar. 3, 1863, ch. 95, § 1, 12 Stat. 769 (authorizing district courts to respond to letters rogatory by compelling witnesses here to provide testimony for use abroad in "suit[s] for the recovery of money or property").[1] In 1948, Congress substantially broadened the scope of as-

---

[1] "[A] *letter rogatory* is the request by a domestic court to a foreign court to take evidence from a certain witness." Jones, International Judicial Assistance: Procedural Chaos and a Program for Reform, 62 Yale L. J. 515, 519 (1953). See Smit, International Litigation under the United States Code, 65 Colum. L. Rev. 1015, 1027 (1965) (hereinafter Smit, International Litigation) (noting foreign courts' use of letters rogatory to request evidence-gathering aid from United States courts).

sistance federal courts could provide for foreign proceedings. That legislation, codified as § 1782, eliminated the prior requirement that the government of a foreign country be a party or have an interest in the proceeding. The measure allowed district courts to designate persons to preside at depositions "to be used in *any civil action* pending in any court in a foreign country with which the United States is at peace." Act of June 25, 1948, ch. 646, § 1782, 62 Stat. 949 (emphasis added). The next year, Congress deleted "civil action" from § 1782's text and inserted "judicial proceeding." Act of May 24, 1949, ch. 139, § 93, 63 Stat. 103. See generally Jones, International Judicial Assistance: Procedural Chaos and a Program for Reform, 62 Yale L. J. 515 (1953).

In 1958, prompted by the growth of international commerce, Congress created a Commission on International Rules of Judicial Procedure (Rules Commission) to "investigate and study existing practices of judicial assistance and cooperation between the United States and foreign countries with a view to achieving improvements." Act of Sept. 2, Pub. L. 85–906, § 2, 72 Stat. 1743; S. Rep. No. 2392, 85th Cong., 2d Sess., 3 (1958); Smit, International Litigation 1015–1016. Six years later, in 1964, Congress unanimously adopted legislation recommended by the Rules Commission;[2] the legislation included a complete revision of § 1782. See Act of Oct. 3, Pub. L. 88–619, § 9, 78 Stat. 997; Smit, International Litigation 1026–1035.

As recast in 1964, § 1782 provided for assistance in obtaining documentary and other tangible evidence as well as testimony. Notably, Congress deleted the words "in any judicial proceeding *pending* in any court in a foreign country," and replaced them with the phrase "in a proceeding in a foreign

---

[2] The Rules Commission also drafted amendments to the Federal Rules of Civil and Criminal Procedure and a Uniform Interstate and International Procedure Act, recommended for adoption by individual States. See Fourth Annual Report of the Commission on International Rules of Judicial Procedure, H. R. Doc. No. 88, 88th Cong., 1st Sess., 2 (1963).

or international tribunal." Brief for United States as *Amicus Curiae* 6, 4a–5a (emphasis added). While the accompanying Senate Report does not account discretely for the deletion of the word "pending,"[3] it explains that Congress introduced the word "tribunal" to ensure that "assistance is not confined to proceedings before conventional courts," but extends also to "administrative and quasi-judicial proceedings." S. Rep. No. 1580, 88th Cong., 2d Sess., 7 (1964); see H. R. Rep. No. 1052, 88th Cong., 1st Sess., 9 (1963) (same). Congress further amended § 1782(a) in 1996 to add, after the reference to "foreign or international tribunal," the words "including criminal investigations conducted before formal accusation." National Defense Authorization Act for Fiscal Year 1996, Pub. L. 104–106, § 1342(b), 110 Stat. 486. Section 1782(a)'s current text reads:

> "The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person .... The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing ... [or may be] the Federal Rules of Civil Procedure.
>
> "A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege."

---

[3] See Smit, International Litigation 1026–1027, n. 72 (commenting that Congress eliminated the word "pending" in order "to facilitate the gathering of evidence prior to the institution of litigation abroad").

B

AMD and Intel are "worldwide competitors in the micro-processor industry." 292 F. 3d 664, 665 (CA9 2002). In Oc-tober 2000, AMD filed an antitrust complaint with the DG-Competition of the European Commission. *Ibid.;* App. 41. "The European Commission is the executive and administra-tive organ of the European Communities." Brief for Com-mission of European Communities as *Amicus Curiae* 1 (hereinafter European Commission *Amicus Curiae*). The Commission exercises responsibility over the wide range of subject areas covered by the European Union treaty; those areas include the treaty provisions, and regulations thereun-der, governing competition. See *ibid.;* Consolidated Ver-sions of Treaty on European Union and Treaty Establishing European Community, Arts. 81 and 82, 2002 O. J. (C 325) 33, 64–65, 67 (hereinafter EC Treaty). The DG-Competition, operating under the Commission's aegis, is the European Union's primary antitrust law enforcer. European Commis-sion *Amicus Curiae* 2. Within the DG-Competition's do-main are anticompetitive agreements (Art. 81) and abuse of dominant market position (Art. 82). *Ibid.;* EC Treaty 64–65.

AMD's complaint alleged that Intel, in violation of Euro-pean competition law, had abused its dominant position in the European market through loyalty rebates, exclusive pur-chasing agreements with manufacturers and retailers, price discrimination, and standard-setting cartels. App. 40–43; Brief for Petitioner 13. AMD recommended that the DG-Competition seek discovery of documents Intel had produced in a private antitrust suit, titled *Intergraph Corp.* v. *Intel Corp.*, brought in a Federal District Court in Alabama. 3 F. Supp. 2d 1255 (ND Ala. 1998), vacated, 195 F. 3d 1346 (CA Fed. 1999), remanded, 88 F. Supp. 2d 1288 (ND Ala. 2000), aff'd, 253 F. 3d 695 (CA Fed. 2001); App. 111; App. to Pet. for

Cert. 13a–14a.[4]   After the DG-Competition declined to seek judicial assistance in the United States, AMD, pursuant to § 1782(a), petitioned the District Court for the Northern District of California[5] for an order directing Intel to produce documents discovered in the *Intergraph* litigation and on file in the federal court in Alabama.   App. to Pet. for Cert. 13a–14a.   AMD asserted that it sought the materials in connection with the complaint it had filed with the European Commission.   *Ibid.*[6]

The District Court denied the application as "[un]supported by applicable authority." *Id.,* at 15a.   Reversing that determination, the Court of Appeals for the Ninth Circuit remanded the case for disposition on the merits.   292 F. 3d, at 669.   The Court of Appeals noted two points significant to its decision: § 1782(a) includes matters before " 'bodies of a quasi-judicial or administrative nature,' " *id.,* at 667 (quoting *In re Letters Rogatory from Tokyo Dist.,* 539 F. 2d 1216, 1218–1219 (CA9 1976)); and, since 1964, the statute's text has contained "[no] requirement that the proceeding be 'pending,' " 292 F. 3d, at 667 (quoting *United States* v. *Sealed 1, Letter of Request for Legal Assistance from the*

---

[4] The Alabama federal court granted summary judgment in Intel's favor in the *Intergraph* litigation, and the Court of Appeals for the Federal Circuit affirmed.   See 253 F. 3d, at 699.   A protective order, imposed by the Alabama federal court, governs the confidentiality of all discovery in that case.   App. 72–73.

[5] Both Intel and AMD are headquartered in the Northern District of California.   *Id.,* at 113.

[6] AMD's complaint to the Commission alleges, *inter alia,* "that Intel has monopolized the worldwide market for Windows-capable *i. e.* x86, microprocessors." *Id.,* at 55–56.   The documents from the *Intergraph* litigation relate to: "(a) the market within which Intel x86 microprocessors compete; (b) the power that Intel enjoys within that market; (c) actions taken by Intel to preserve and enhance its position in the market; and (d) the impact of the actions taken by Intel to preserve and enhance its market position."   App. 55.

*Deputy Prosecutor Gen. of Russian Federation,* 235 F. 3d 1200, 1204 (CA9 2000)); see *supra,* at 248–249. A proceeding judicial in character, the Ninth Circuit further observed, was a likely sequel to the European Commission's investigation: "[The European Commission is] a body authorized to enforce the EC Treaty with written, binding decisions, enforceable through fines and penalties. [The Commission's] decisions are appealable to the Court of First Instance and then to the [European] Court of Justice. Thus, the proceeding for which discovery is sought is, at minimum, one leading to quasi-judicial proceedings." 292 F. 3d, at 667; see *infra,* at 254–255 (presenting synopsis of Commission proceedings and judicial review of Commission decisions).

The Court of Appeals rejected Intel's argument that § 1782(a) called for a threshold showing that the documents AMD sought in the California federal court would have been discoverable by AMD in the European Commission investigation had those documents been located within the Union. 292 F. 3d, at 668. Acknowledging that other Courts of Appeals had construed § 1782(a) to include a "foreign-discoverability" rule, the Ninth Circuit found "nothing in the plain language or legislative history of Section 1782, including its 1964 and 1996 amendments, to require a threshold showing [by] the party seeking discovery that what is sought be discoverable in the foreign proceeding," *id.,* at 669. A foreign-discoverability threshold, the Court of Appeals added, would disserve § 1782(a)'s twin aims of "providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to our courts." *Ibid.*

On remand, a Magistrate Judge found AMD's application "overbroad," and recommended an order directing AMD to submit a more specific discovery request confined to documents directly relevant to the European Commission investigation. App. to Brief in Opposition 1a–6a; Brief for Petitioner 15, n. 9. The District Court has stayed further

proceedings pending disposition of the questions presented by Intel's petition for certiorari. *Ibid.;* see Order Vacating Hearing Date, No. C 01–7033 MISC JW (ND Cal., Dec. 1, 2003) (stating "Intel may renotice its motion for de novo review of the Magistrate Judge's decision after the Supreme Court issues its ruling").

We granted certiorari, 540 U. S. 1003 (2003), in view of the division among the Circuits on the question whether § 1782(a) contains a foreign-discoverability requirement.[7] We now hold that § 1782(a) does not impose such a requirement. We also granted review on two other questions. First, does § 1782(a) make discovery available to complainants, such as AMD, who do not have the status of private "litigants" and are not sovereign agents? See Pet. for Cert. (i). Second, must a "proceeding" before a foreign "tribunal" be "pending" or at least "imminent" for an applicant to invoke § 1782(a) successfully? Compare *In re Letter of Request from Crown Prosecution Serv. of United Kingdom,* 870 F. 2d 686, 691 (CADC 1989) (proceeding must be "within reasonable contemplation"), with *In re Ishihari Chemical Co.,* 251 F. 3d 120, 125 (CA2 2001) (proceeding must be "imminent—very likely to occur and very soon to occur"); *In re International Judicial Assistance (Letter Rogatory) for Federative Republic of Brazil,* 936 F. 2d 702, 706 (CA2 1991)

---

[7] The First and Eleventh Circuits have construed § 1782(a) to contain a foreign-discoverability requirement. See *In re Application of Asta Medica, S. A.,* 981 F. 2d 1, 7 (CA1 1992); *In re Request for Assistance from Ministry of Legal Affairs of Trinidad and Tobago,* 848 F. 2d 1151, 1156 (CA11 1988). The Fourth and Fifth Circuits have held that no such requirement exists if the § 1782(a) applicant is a foreign sovereign. See *In re Letter of Request from Amtsgericht Ingolstadt, F. R. G.,* 82 F. 3d 590, 592 (CA4 1996); *In re Letter Rogatory from First Court of First Instance in Civil Matters, Caracas, Venezuela,* 42 F. 3d 308, 310–311 (CA5 1995). In alignment with the Ninth Circuit, the Second and Third Circuits have rejected a foreign-discoverability requirement. See *In re Application of Gianoli Aldunate,* 3 F. 3d 54, 59–60 (CA2 1993); *In re Bayer AG,* 146 F. 3d 188, 193–194 (CA3 1998).

(same). Answering "yes" to the first question and "no" to the second, we affirm the Ninth Circuit's judgment.

## II

To place this case in context, we sketch briefly how the European Commission, acting through the DG-Competition, enforces European competition laws and regulations. The DG-Competition's "overriding responsibility" is to conduct investigations into alleged violations of the European Union's competition prescriptions. See European Commission *Amicus Curiae* 6. On receipt of a complaint or *sua sponte*, the DG-Competition conducts a preliminary investigation. *Ibid.* In that investigation, the DG-Competition "may take into account information provided by a complainant, and it may seek information directly from the target of the complaint." *Ibid.* "Ultimately, DG Competition's preliminary investigation results in a formal written decision whether to pursue the complaint. If [the DG-Competition] declines to proceed, that decision is subject to judicial review" by the Court of First Instance and, ultimately, by the court of last resort for European Union matters, the Court of Justice for the European Communities (European Court of Justice). *Id.*, at 7; App. 50; see, *e. g.*, Case T–241/97, *Stork Amsterdam BV* v. *Commission*, 2000 E. C. R. II–309, [2000] 5 C. M. L. R. 31 (Ct. 1st Instance 2000) (annulling Commission's rejection of a complaint).[8]

If the DG-Competition decides to pursue the complaint, it typically serves the target of the investigation with a formal "statement of objections" and advises the target of its intention to recommend a decision finding that the target has violated European competition law. European Commission

---

[8] The Court of First Instance, which is "attached to the [European] Court of Justice," was established "to improve the judicial protection of individual interests, particularly in cases requiring the examination of complex facts, whilst at the same time reducing the workload of the [European] Court of Justice." C. Kerse, E. C. Antitrust Procedure 37 (3d ed. 1994).

*Amicus Curiae* 7. The target is entitled to a hearing before an independent officer, who provides a report to the DG-Competition. *Ibid.;* App. 18–27. Once the DG-Competition has made its recommendation, the European Commission may "dismis[s] the complaint, or issu[e] a decision finding infringement and imposing penalties." European Commission *Amicus Curiae* 7. The Commission's final action dismissing the complaint or holding the target liable is subject to review in the Court of First Instance and the European Court of Justice. *Ibid.;* App. 52–53, 89–90.

Although lacking formal "party" or "litigant" status in Commission proceedings, the complainant has significant procedural rights. Most prominently, the complainant may submit to the DG-Competition information in support of its allegations, and may seek judicial review of the Commission's disposition of a complaint. See European Commission *Amicus Curiae* 7–8, and n. 5; *Stork Amsterdam*, 2000 E. C. R. II, at 328–329, ¶¶ 51–53.

### III

As "in all statutory construction cases, we begin [our examination of § 1782] with the language of the statute." *Barnhart* v. *Sigmon Coal Co.,* 534 U. S. 438, 450 (2002). The language of § 1782(a), confirmed by its context, our examination satisfies us, warrants this conclusion: The statute authorizes, but does not require, a federal district court to provide assistance to a complainant in a European Commission proceeding that leads to a dispositive ruling, *i. e.,* a final administrative action both responsive to the complaint and reviewable in court.[9] Accordingly, we reject the categorical limitations Intel would place on the statute's reach.

---

[9] The dissent suggests that the Commission "more closely resembles a prosecuting authority, say, the Department of Justice's Antitrust Division, than an administrative agency that adjudicates cases, say, the Federal Trade Commission." *Post,* at 270. That is a questionable suggestion in view of the European Commission's authority to determine liability and impose penalties, dispositions that will remain final unless overturned by the European courts. See *supra* this page.

## A

We turn first to Intel's contention that the catalog of "interested person[s]" authorized to apply for judicial assistance under § 1782(a) includes only "litigants, foreign sovereigns, and the designated agents of those sovereigns," and excludes AMD, a mere complainant before the Commission, accorded only "limited rights." Brief for Petitioner 10–11, 24, 26–27. Highlighting § 1782's caption, "[a]ssistance to foreign and international tribunals and to *litigants* before such tribunals," Intel urges that the statutory phrase "any interested person" should be read, correspondingly, to reach only "litigants." *Id.*, at 24 (internal quotation marks omitted, emphasis in original).

The caption of a statute, this Court has cautioned, "cannot undo or limit that which the [statute's] text makes plain." *Trainmen* v. *Baltimore & Ohio R. Co.*, 331 U. S. 519, 529 (1947). The text of § 1782(a), "upon the application of any interested person," plainly reaches beyond the universe of persons designated "litigant." No doubt litigants are included among, and may be the most common example of, the "interested person[s]" who may invoke § 1782; we read § 1782's caption to convey no more. See, *e. g.*, *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 482–483 (2001) (rejecting narrow reading of 42 U. S. C. § 7511(a) based on caption in light of "specifically" broader coverage of provision's text).

The complainant who triggers a European Commission investigation has a significant role in the process. As earlier observed, see *supra*, at 255, in addition to prompting an investigation, the complainant has the right to submit information for the DG-Competition's consideration, and may proceed to court if the Commission discontinues the investigation or dismisses the complaint. App. 52–53. Given these participation rights, a complainant "possess[es] a reasonable interest in obtaining [judicial] assistance," and therefore qualifies as an "interested person" within any fair construction of that term. See Smit, International Litiga-

tion 1027 ("any interested person" is "intended to include not only litigants before foreign or international tribunals, but also foreign and international officials as well as any other person whether he be designated by foreign law or international convention or merely possess a reasonable interest in obtaining the assistance").[10]

## B

We next consider whether the assistance in obtaining documents here sought by an "interested person" meets the specification "for use in a foreign or international tribunal." Beyond question the reviewing authorities, both the Court of First Instance and the European Court of Justice, qualify as tribunals. But those courts are not proof-taking instances. Their review is limited to the record before the Commission. See Tr. of Oral Arg. 17. Hence, AMD could "use" evidence in the reviewing courts only by submitting it to the Commission in the current, investigative stage.

Moreover, when Congress established the Commission on International Rules of Judicial Procedure in 1958, see *supra*, at 248, it instructed the Rules Commission to recommend

---

[10] The term "interested person," Intel notes, also appears in 28 U. S. C. § 1696(a), a provision enacted concurrently with the 1964 revision of § 1782. Brief for Petitioner 27. Section 1696(a) authorizes federal district courts to "order service . . . of any document issued in connection with a [foreign] proceeding" pursuant to a request made by the foreign tribunal "or upon application of any interested person." Intel reasons that "[t]he class of private parties qualifying as 'interested persons' for [service] purposes *must* of course be limited to litigants, because private parties . . . cannot serve 'process' unless they have filed suit." Brief for Petitioner 27 (emphasis in original). Section 1696(a), however, is not limited to service of *process*; it allows service of "any document" issued in connection with a foreign proceeding. As the Government points out by way of example: "[I]f the European Commission's procedures were revised to require a complainant to serve its complaint on a target company, but the complainant's role in the Commission's proceedings otherwise remained unchanged, [§ ]1696 would authorize the district court to provide that 'interested [person]' with assistance in serving that document." Brief for United States as *Amicus Curiae* 20, n. 11.

procedural revisions "for the rendering of assistance to foreign courts *and quasi-judicial agencies.*" §2, 72 Stat. 1743 (emphasis added). Section 1782 had previously referred to "any judicial proceeding." The Rules Commission's draft, which Congress adopted, replaced that term with "a proceeding in a foreign or international tribunal." See *supra,* at 248–249. Congress understood that change to "provid[e] the possibility of U. S. judicial assistance in connection with [administrative and quasi-judicial proceedings abroad]." S. Rep. No. 1580, at 7–8; see Smit, International Litigation 1026–1027, and nn. 71, 73 ("[t]he term 'tribunal' . . . includes investigating magistrates, administrative and arbitral tribunals, and quasi-judicial agencies, as well as conventional civil, commercial, criminal, and administrative courts"; in addition to affording assistance in cases before the European Court of Justice, §1782, as revised in 1964, "permits the rendition of proper aid in proceedings before the [European] Commission in which the Commission exercises quasi-judicial powers"). See also European Commission *Amicus Curiae* 9 ("[W]hen the Commission acts on DG Competition's final recommendation . . . the investigative function blur[s] into decisionmaking."). We have no warrant to exclude the European Commission, to the extent that it acts as a first-instance decisionmaker, from §1782(a)'s ambit. See 292 F. 3d, at 667; *supra,* at 255, n. 9.

C

Intel also urges that AMD's complaint has not progressed beyond the investigative stage; therefore, no adjudicative action is currently or even imminently on the Commission's agenda. Brief for Petitioner 27–29.

Section 1782(a) does not limit the provision of judicial assistance to "pending" adjudicative proceedings. In 1964, when Congress eliminated the requirement that a proceeding be "judicial," Congress also deleted the requirement that a proceeding be "pending." See *supra,* at 248–249. "When

Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone* v. *INS*, 514 U. S. 386, 397 (1995). The legislative history of the 1964 revision is in sync; it reflects Congress' recognition that judicial assistance would be available "whether the foreign or international proceeding *or investigation* is of a criminal, civil, administrative, or other nature." S. Rep. No. 1580, at 9 (emphasis added).

. In 1996, Congress amended § 1782(a) to clarify that the statute covers "criminal investigations conducted before formal accusation." See § 1342(b), 110 Stat. 486; *supra*, at 249. Nothing suggests that this amendment was an endeavor to rein in, rather than to confirm, by way of example, the broad range of discovery authorized in 1964. See S. Rep. No. 1580, at 7 ("[T]he [district] court[s] have discretion to grant assistance when proceedings are pending before investigating magistrates in foreign countries.").

In short, we reject the view, expressed in *In re Ishihara Chemical Co.*, that § 1782 comes into play only when adjudicative proceedings are "pending" or "imminent." See 251 F. 3d, at 125 (proceeding must be "imminent—very likely to occur and very soon to occur" (internal quotation marks omitted)). Instead, we hold that § 1782(a) requires only that a dispositive ruling by the Commission, reviewable by the European courts, be within reasonable contemplation. See *Crown Prosecution Serv. of United Kingdom*, 870 F. 2d, at 691; *In re Request for Assistance from Ministry of Legal Affairs of Trinidad and Tobago*, 848 F. 2d 1151, 1155, and n. 9 (CA11 1988); Smit, International Litigation 1026 ("It is not necessary . . . for the [adjudicative] proceeding to be pending at the time the evidence is sought, but only that the evidence is eventually to be used in such a proceeding.").

## D

We take up next the foreign-discoverability rule on which lower courts have divided: Does § 1782(a) categorically bar a

district court from ordering production of documents when the foreign tribunal or the "interested person" would not be able to obtain the documents if they were located in the foreign jurisdiction? See *supra*, at 253–254, and n. 7.

We note at the outset, and count it significant, that § 1782(a) expressly shields privileged material: "A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege." See S. Rep. No. 1580, at 9 ("[N]o person shall be required under the provisions of [§ 1782] to produce any evidence in violation of an applicable privilege."). Beyond shielding material safeguarded by an applicable privilege, however, nothing in the text of § 1782 limits a district court's production-order authority to materials that could be discovered in the foreign jurisdiction if the materials were located there. "If Congress had intended to impose such a sweeping restriction on the district court's discretion, at a time when it was enacting liberalizing amendments to the statute, it would have included statutory language to that effect." *In re Application of Gianoli Aldunate*, 3 F. 3d 54, 59 (CA2 1993); accord *Four Pillars Enterprises Co.* v. *Avery Dennison Corp.*, 308 F. 3d 1075, 1080 (CA9 2002); 292 F. 3d, at 669 (case below); *In re Bayer AG*, 146 F. 3d 188, 193–194 (CA3 1998).[11]

Nor does § 1782(a)'s legislative history suggest that Congress intended to impose a blanket foreign-discoverability rule on the provision of assistance under § 1782(a). The Senate Report observes in this regard that § 1782(a) "leaves the issuance of an appropriate order to the discretion of the court

---

[11] Section 1782(a) instructs that a district court's discovery order "may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing . . . [or may be] the Federal Rules of Civil Procedure." This mode-of-proof-taking instruction imposes no substantive limitation on the discovery to be had.

which, in proper cases, may refuse to issue an order or may impose conditions it deems desirable." S. Rep. No. 1580, at 7.

Intel raises two policy concerns in support of a foreign-discoverability limitation on § 1782(a) aid—avoiding offense to foreign governments, and maintaining parity between litigants. Brief for Petitioner 23–24; Reply Brief 5, 13–14; see *In re Application of Asta Medica, S. A.*, 981 F. 2d 1, 6 (CA1 1992) ("Congress did not seek to place itself on a collision course with foreign tribunals and legislatures, which have carefully chosen the procedures and laws best suited to their concepts of litigation."). While comity and parity concerns may be important as touchstones for a district court's exercise of discretion in particular cases, they do not permit our insertion of a generally applicable foreign-discoverability rule into the text of § 1782(a).

We question whether foreign governments would in fact be offended by a domestic prescription permitting, but not requiring, judicial assistance. A foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions—reasons that do not necessarily signal objection to aid from United States federal courts. See *Bayer*, 146 F. 3d, at 194 ("[T]here is no reason to assume that because a country has not adopted a particular discovery procedure, it would take offense at its use."); Smit, Recent Developments in International Litigation, 35 S. Tex. L. Rev. 215, 235–236 (1994) (hereinafter Smit, Recent Developments) (same).[12] A foreign tribunal's reluctance to order

---

[12] Most civil-law systems lack procedures analogous to the pretrial discovery regime operative under the Federal Rules of Civil Procedure. See ALI, ALI/Unidroit Principles and Rules of Transnational Civil Procedure, Proposed Final Draft, Rule 22, Comment R–22E, p. 118 (2004) ("Disclosure and exchange of evidence under the civil-law systems are generally more restricted, or nonexistent."); Hazard, Discovery and the Role of the Judge in Civil Law Jurisdictions, 73 Notre Dame L. Rev. 1017, 1018–1019 (1998) (same). See also Smit, Recent Developments 235, n. 93 ("The drafters [of § 1782] were quite aware of the circumstance that civil law systems

production of materials present in the United States similarly may signal no resistance to the receipt of evidence gathered pursuant to § 1782(a). See *South Carolina Ins. Co. v. Assurantie · Maatschappij "De Zeven Provincien" N. V.,* [1987] 1 App. Cas. 24 (House of Lords ruled that nondiscoverability under English law did not stand in the way of a litigant in English proceedings seeking assistance in the United States under § 1782).[13] When the foreign tribunal would readily accept relevant information discovered in the United States, application of a foreign-discoverability rule would be senseless. The rule in that situation would serve only to thwart § 1782(a)'s objective to assist foreign tribunals in obtaining relevant information that the tribunals may find useful but, for reasons having no bearing on international comity, they cannot obtain under their own laws.

Concerns about maintaining parity among adversaries in litigation likewise do not provide a sound basis for a cross-the-board foreign-discoverability rule. When information is sought by an "interested person," a district court could condition relief upon that person's reciprocal exchange of information. See *Euromepa, S. A. v. R. Esmerian, Inc.,* 51 F. 3d 1095, 1102 (CA2 1995); Smit, Recent Developments 237. Moreover, the foreign tribunal can place conditions on its acceptance of the information to maintain whatever measure of parity it concludes is appropriate. See *Euromepa,* 51 F. 3d, at 1101.[14]

---

generally do not have American type pretrial discovery, and do not compel the production of documentary evidence.").

[13] See Smit, American Assistance to Litigation in Foreign and International Tribunals: Section 1782 of Title 28 of the U. S. C. Revisited, 25 Syracuse J. Int'l L. & Comm. 1, 13, and n. 63 (1998) (hereinafter Smit, American Assistance) (noting that "[a] similar decision was rendered by the President of the Amsterdam District Court").

[14] A civil-law court, furthermore, might attend to litigant-parity concerns in its merits determination: "In civil law countries, documentary evidence is generally submitted as an attachment to the pleadings or as part of a report by an expert. . . . A civil law court generally rules upon the question of whether particular documentary evidence may be relied

We also reject Intel's suggestion that a § 1782(a) applicant must show that United States law would allow discovery in domestic litigation analogous to the foreign proceeding. Brief for Petitioner 19–20 ("[I]f AMD were pursuing this matter in the United States, U. S. law would preclude it from obtaining discovery of Intel's documents."). Section 1782 is a provision for assistance to tribunals abroad. It does not direct United States courts to engage in comparative analysis to determine whether analogous proceedings exist here. Comparisons of that order can be fraught with danger.[15] For example, we have in the United States no close analogue to the European Commission regime under which AMD is not free to mount its own case in the Court of First Instance or the European Court of Justice, but can participate only as complainant, an "interested person," in Commission-steered proceedings. See L. Ritter, W. Braun, & F. Rawlinson, European Competition Law: A Practitioner's Guide 824–826 (2d ed. 2000) (describing a complaint as a potentially "more certain (and cheaper) alternative to private enforcement through the [European Union's member states'] courts").[16]

upon only in its decision on the merits." Smit, Recent Developments 235–236, n. 94.

[15] Among its proposed rules, the dissent would exclude from § 1782(a)'s reach discovery not available "under foreign law" *and* "under domestic law in analogous circumstances." *Post*, at 270. Because comparison of systems is slippery business, the dissent's rule is infinitely easier to state than to apply. As the dissent's examples tellingly reveal, see *post*, at 267–268, a foreign proceeding may have no direct analogue in our legal system. In light of the variety of foreign proceedings resistant to ready classification in domestic terms, Congress left unbounded by categorical rules the determination whether a matter is proceeding "in a foreign or international tribunal." While we reject the rules the dissent would inject into the statute, see *post*, at 269–273, we do suggest guides for the exercise of district-court discretion, see *infra*, at 264–266.

[16] At oral argument, counsel for AMD observed: "In the United States, we could have brought a private action in the district court for these very same violations. In Europe, our only Europe-wide remedy was to go to the [European Commission]." Tr. of Oral Arg. 33.

## IV

As earlier emphasized, see *supra*, at 260–261, a district court is not required to grant a § 1782(a) discovery application simply because it has the authority to do so. See *United Kingdom* v. *United States*, 238 F. 3d 1312, 1319 (CA11 2001) ("a district court's compliance with a § 1782 request is not mandatory"). We note below factors that bear consideration in ruling on a § 1782(a) request.

First, when the person from whom discovery is sought is a participant in the foreign proceeding (as Intel is here), the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad. A foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence. App. to Reply Brief 4a ("When th[e] person [who is to produce the evidence] is a party to the foreign proceedings, the foreign or international tribunal can exercise its own jurisdiction to order production of the evidence." (quoting declaration of H. Smit in *In re: Application of Ishihara Chemical Co., Ltd., For order to take discovery of Shipley Company, L. L. C., Pursuant to 28 U. S. C. § 1782*, Misc. 99–232 (FB) (EDNY, May 18, 2000))). In contrast, nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid. See App. to Reply Brief 4a.

Second, as the 1964 Senate Report suggests, a court presented with a § 1782(a) request may take into account the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U. S. federal-court judicial assistance. See S. Rep. No. 1580, at 7. Further, the grounds Intel urged for categorical limitations on § 1782(a)'s scope may be relevant in determining whether a discovery order should be granted in a particular case. See Brief for United States as *Amicus Curiae* 23. Specifically,

a district court could consider whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States. See *id.*, at 27. Also, unduly intrusive or burdensome requests may be rejected or trimmed. See *Bayer*, 146 F. 3d, at 196 (remanding for district-court consideration of "appropriate measures, if needed, to protect the confidentiality of materials"); *In re Application of Esses*, 101 F. 3d 873, 876 (CA2 1996) (affirming limited discovery that is neither "burdensome [n]or duplicative").

Intel maintains that, if we do not accept the categorical limitations it proposes, then, at least, we should exercise our supervisory authority to adopt rules barring § 1782(a) discovery here. Brief for Petitioner 34–36; cf. *Thomas* v. *Arn*, 474 U. S. 140, 146–147 (1985) (this Court can establish rules of "sound judicial practice" (internal quotation marks omitted)). We decline, at this juncture, to adopt supervisory rules. Any such endeavor at least should await further experience with § 1782(a) applications in the lower courts.[17] The European Commission has stated in *amicus curiae* briefs to this Court that it does not need or want the District Court's assistance. See European Commission *Amicus Curiae* 11–16; Brief for European Commission as *Amicus Curiae* in Sup-

---

[17] The dissent sees a need for "categorical limits" to ward off "expensive, time-consuming battles about discovery." *Post*, at 268. That concern seems more imaginary than real. There is no evidence whatsoever, in the 40 years since § 1782(a)'s adoption, see *supra*, at 248, of the costs, delays, and forced settlements the dissent hypothesizes. See Smit, American Assistance 1, 19–20 ("The revised section 1782 . . . has been applied in scores of cases. . . . All in all, Section 1782 has largely served the purposes for which it was enacted. . . . [T]here appears to be no reason for seriously considering, at this time, any statutory amendments.").

The Commission, we note, is not obliged to respond to a discovery request of the kind AMD has made. The party targeted in the complaint and in the § 1782(a) application would no doubt wield the laboring oar in opposing discovery, as Intel did here. Not only was there no "need for the Commission to respond," *post*, at 271, the Commission in fact made no submission at all in the instant matter before it reached this Court.

port of Pet. for Cert. 4–8. It is not altogether clear, however, whether the Commission, which may itself invoke § 1782(a) aid, means to say "never" or "hardly ever" to judicial assistance from United States courts. Nor do we know whether the European Commission's views on § 1782(a)'s utility are widely shared in the international community by entities with similarly blended adjudicative and prosecutorial functions.

Several facets of this case remain largely unexplored. Intel and its *amici* have expressed concerns that AMD's application, if granted in any part, may yield disclosure of confidential information, encourage "fishing expeditions," and undermine the European Commission's Leniency Program. See Brief for Petitioner 37; European Commission *Amicus Curiae* 11–16.[18] Yet no one has suggested that AMD's complaint to the Commission is pretextual. Nor has it been shown that § 1782(a)'s preservation of legally applicable privileges, see *supra*, at 260, and the controls on discovery available to the District Court, see, *e. g.*, Fed. Rule Civ. Proc. 26(b)(2) and (c), would be ineffective to prevent discovery of Intel's business secrets and other confidential information.

On the merits, this case bears closer scrutiny than it has received to date. Having held that § 1782(a) authorizes, but does not require, discovery assistance, we leave it to the courts below to ensure an airing adequate to determine what, if any, assistance is appropriate.[19]

---

[18] The European Commission's "Leniency Program" allows "cartel participants [to] confess their own wrongdoing" in return for prosecutorial leniency. European Commission *Amicus Curiae* 14–15; Brief for European Commission as *Amicus Curiae* in Support of Pet. for Cert. 6.

[19] The District Court might also consider the significance of the protective order entered by the District Court for the Northern District of Alabama. See App. 73; *supra*, at 251, n. 4; cf. *Four Pillars Enterprises Co. v. Avery Dennison Corp.*, 308 F. 3d 1075, 1080 (CA9 2002) (affirming district-court denial of discovery that "would frustrate the protective order of [another] federal [district] court").

* * *

For the reasons stated, the judgment of the Court of Appeals for the Ninth Circuit is

*Affirmed.*

JUSTICE O'CONNOR took no part in the consideration or decision of this case.

JUSTICE SCALIA, concurring in the judgment.

As today's opinion shows, the Court's disposition is required by the text of the statute. None of the limitations urged by petitioner finds support in the categorical language of 28 U. S. C. § 1782(a). That being so, it is not only (as I think) improper but also quite unnecessary to seek repeated support in the words of a Senate Committee Report—which, as far as we know, not even the full committee, much less the full Senate, much much less the House, and much much much less the President who signed the bill, agreed with. Since, moreover, I have not read the entire so-called legislative history, and have no need or desire to do so, so far as I know the statements of the Senate Report may be contradicted elsewhere.

Accordingly, because the statute—the only sure expression of the will of Congress—says what the Court says it says, I join in the judgment.

JUSTICE BREYER, dissenting.

The Court reads the scope of 28 U. S. C. § 1782 to extend beyond what I believe Congress might reasonably have intended. Some countries allow a private citizen to ask a court to review a criminal prosecutor's decision not to prosecute. On the majority's reading, that foreign private citizen could ask an American court to help the citizen obtain information, even if the foreign prosecutor were indifferent or unreceptive. See, *e. g.,* Mann, Criminal Procedure, in Introduction to the Law of Israel 267, 278 (A. Shapira & K.

DeWitt-Arar eds. 1995). Many countries allow court review of decisions made by any of a wide variety of nonprosecutorial, nonadjudicative bodies. On the majority's reading, a British developer, hoping to persuade the British Housing Corporation to grant it funding to build a low-income housing development, could ask an American court to demand that an American firm produce information designed to help the developer obtain the British grant. Cf., *e. g.*, Mayer, The Housing Corporation: Multiple Lines of Accountability, in Quangos, Accountability and Reform: The Politics of Quasi-Government 111, 114 (M. Flinders & M. Smith eds. 1999). This case itself suggests that an American firm, hoping to obtain information from a competitor, might file an antitrust complaint with the European antitrust authorities, thereby opening up the possibility of broad American discovery—contrary to the antitrust authorities' desires.

One might ask why it is wrong to read the statute as permitting the use of America's court processes to obtain information in such circumstances. One might also ask why American courts should not deal *case by case* with any problems of the sort mentioned. The answer to both of these questions is that discovery and discovery-related judicial proceedings take time, they are expensive, and cost and delay, or threats of cost and delay, can themselves force parties to settle underlying disputes. See The Brookings Institution, Justice For All: Reducing Costs and Delay in Civil Litigation, Report of a Task Force 6–7 (1989) (lawyers surveyed estimated that 60% of litigation costs in a typical federal case are attributable to discovery and agreed that high litigation costs are often attributable to abuse of the discovery process); Federal Judicial Center, T. Willging, J. Shapard, D. Stienstra, & D. Miletich, Discovery and Disclosure Practice, Problems, and Proposals for Change 1–2, 4, 8, 14–16 (Tables 3–5) (1997) (study outlining costs of discovery). To the extent that expensive, time-consuming battles about discovery proliferate, they deflect the attention of foreign authori-

ties from other matters those authorities consider more important; they can lead to results contrary to those that foreign authorities desire; and they can promote disharmony among national and international authorities, rather than the harmony that § 1782 seeks to achieve. They also use up domestic judicial resources and crowd our dockets.

That is why I believe the statute, while granting district courts broad authority to order discovery, nonetheless must be read as subject to some categorical limits, at least at the outer bounds—a matter that today's decision makes even more important. Those limits should rule out instances in which it is virtually certain that discovery (if considered case by case) would prove unjustified.

This case does not require us to find a comprehensive set of limits. But it does suggest two categorical limitations, which I would adopt. First, when a foreign entity possesses few tribunal-like characteristics, so that the applicability of the statute's word "tribunal" is in serious doubt, then a court should pay close attention to the foreign entity's own view of its "tribunal"-like or non-"tribunal"-like status. By paying particular attention to the views of the very foreign nations that Congress sought to help, courts would better achieve Congress' basic cooperative objectives in enacting the statute. See Act of Sept. 2, 1958, Pub. L. 85–906, § 2, 72 Stat. 1743 (creating Commission on International Rules of Judicial Procedure to investigate and improve judicial "cooperation" between the United States and other countries).

The concept of paying special attention to administrative views is well established in American law. Cf. *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843 (1984); *Skidmore* v. *Swift & Co.*, 323 U. S. 134, 140 (1944). Like American administrators, foreign administrators are likely to understand better than American courts their own job and, for example, how discovery rights might affect their ability to carry out their responsibilities. I can think of no reason why Congress would have intended a

court to pay *less* attention to the foreign entity's view of the matter than courts ordinarily pay to a domestic agency's understanding of the workings of its own statute.

Second, a court should not permit discovery where both of the following are true: (1) A private person seeking discovery would not be entitled to that discovery under foreign law, *and* (2) the discovery would not be available under domestic law in analogous circumstances. The Federal Rules of Civil Procedure, for example, make only limited provisions for nonlitigants to obtain certain discovery. See Fed. Rule Civ. Proc. 27. The limitations contained in the Rules help to avoid discovery battles launched by firms simply seeking information from competitors. Where there is benefit in permitting such discovery, and the benefit outweighs the cost of allowing it, one would expect either domestic law or foreign law to authorize it. If, notwithstanding the fact that it would not be allowed under either domestic or foreign law, there is some special need for the discovery in a particular instance, one would expect to find foreign governmental or intergovernmental authorities making the case for that need. Where *none* of these circumstances is present, what benefit could offset the obvious costs to the competitor and to our courts? I cannot think of any.

Application of either of these limiting principles would require dismissal of this discovery proceeding. First, the Commission of the European Communities' (Commission) antitrust authority's status as a "tribunal" is questionable. In many respects, the Commission more closely resembles a prosecuting authority, say, the Department of Justice's Antitrust Division, than an administrative agency that adjudicates cases, say, the Federal Trade Commission. To my knowledge, those who decide whether to bring an antitrust prosecution on the Commission's behalf are not judges. See App. 96; Wils, The Combination of the Investigative and Prosecutorial Function and the Adjudicative Function in EC Antitrust Enforcement: A Legal and Economic Analysis, 27

World Competition Law and Economics Review 201, 207 (June 2004) (explaining, in an article written by a member of the Commission's Legal Service, that "in European Commission proceedings there is no independent initial adjudicator . . . and the Commissioners do not sit as judges hearing directly both sides of the case"). They do not adjudicate adversary proceedings on the basis of proofs and argument. *Ibid.* Nor, as the majority appears to recognize, does the later availability of a reviewing court matter where "review is limited to the record before the Commission," and "AMD could 'use' evidence in the reviewing courts only by submitting it to the Commission in the current, investigative stage." *Ante,* at 257. At a minimum, then, the question whether the Commission is a "tribunal" is unclear. See Wils, *supra,* at 207–209 (noting the scholarly and legal debate as to whether the Commission's antitrust investigation and enforcement activities qualify it as an " 'independent and impartial tribunal' " for purposes of the European Convention on Human Rights).

At the same time, the Commission has told this Court that it is not a "tribunal" under the Act. It has added that, should it be considered, against its will, a "tribunal," its "ability to carry out its governmental responsibilities" will be seriously threatened. Brief for Commission of the European Communities as *Amicus Curiae* 2. Given the potential need for the Commission to respond when a private firm (including an American company) files a complaint with the Commission and seeks discovery in an American court (say, from a competitor), its concerns are understandable.

The Commission's characterization of its own functions is, in my view, entitled to deference. The majority disregards the Commission's opinion and states categorically that "the Commission is a § 1782(a) 'tribunal' when it acts as a first-instance decisionmaker." *Ante,* at 246–247. In so ignoring the Commission, the majority undermines the comity interests § 1782 was designed to serve and disregards the maxim

that we construe statutes so as to "hel[p] the potentially conflicting laws of different nations work together in harmony— a harmony particularly needed in today's highly interdependent commercial world." *F. Hoffmann-La Roche Ltd* v. *Empagran S. A., ante,* at 164–165.

The second limiting factor is also present. Neither Advanced Micro Devices, Inc. (AMD), nor any comparable private party would be able to obtain the kind of discovery AMD seeks, either in Europe or in the United States. In respect to Europe, the Commission has told us that any person in the world is free to file a complaint with the Commission, but it is the Commission that then investigates. The private complainant lacks any authority to obtain discovery of business secrets and commercial information. See Brief for Commission of the European Communities as *Amicus Curiae* 13, and n. 15. In respect to the United States, AMD is a nonlitigant, apart from this discovery proceeding. Conditions under which a nonlitigant may obtain discovery are limited. AMD does not suggest that it meets those conditions, or that it is comparable in any other way to one who might obtain discovery under roughly analogous circumstances. In addition, the material it seeks is under a protective order. See *ante,* at 251, n. 4.

What is the legal source of these limiting principles? In my view, they, and perhaps others, are implicit in the statute itself, given its purpose and use of the terms "tribunal" and "interested person." §1782(a). But even if they are not, this Court's "supervisory powers . . . permit, at the least, the promulgation of procedural rules governing the management of litigation," not to mention "'procedures deemed desirable from the viewpoint of sound judicial practice although in nowise commanded by statute or by the Constitution.'" *Thomas* v. *Arn,* 474 U. S. 140, 146–147 (1985) (quoting *Cupp* v. *Naughten,* 414 U. S. 141, 146 (1973)). See also *Dickerson* v. *United States,* 530 U. S. 428, 437 (2000) ("This Court has supervisory authority over the federal courts, and we may

use that authority to prescribe rules of evidence and procedure that are binding in those tribunals"). Intel Corp. has asked us to exercise those powers in this case. Brief for Petitioner 34–38. We should do so along the lines that I suggest; consequently, we should reverse the judgment below and order the complaint in this case dismissed.

I respectfully dissent from the Court's contrary determination.